BLANTON *v.* JONESBORO BUILDING & LOAN ASSOCIATION.

Opinion delivered February 20, 1928.

1. DRAINS—SALE OF LAND FOR NONPAYMENT OF DRAINAGE TAXES.— Where land, subject to drainage taxes, was sold to the drainage district in a suit for delinquent taxes, the proceedings being in all respects valid, the district acquired title to the property under conveyance from the commissioner after the period for redemption had expired.

2. DRAINS—AUTHORITY OF DRAINAGE DISTRICT TO RESELL PROPERTY BOUGHT IN.—Where a drainage district bid in land at a public sale under foreclosure decree for nonpayment of drainage assessments, the district had power to resell the lands for the purpose of acquiring funds for the prosecution of the drainage work.

3. DRAINS—AGREEMENT AS TO REDEMPTION OF LAND.—Correspondence between the attorney of the mortgagee and the secretary of a drainage district, by which the secretary was requested to draw on the mortgagee for the amount of drainage assessments on particular property, which was described, and where the secretary promised to draw as requested and to execute a quitclaim deed, *held* to constitute a valid contract for conveyance of property bid in by the drainage district for unpaid assessments, and the contract was specifically enforceable between the parties.

4. DRAINS—AUTHORITY OF SECRETARY OF DRAINAGE DISTRICT.—Where the secretary of a drainage district organized under Acts 1917, p. 1053, customarily acted for the board in making contracts for redemption of land or for repurchase thereof, after foreclosure for unpaid drainage assessments, such secretary had implied authority to contract for conveyance of property bid in by the district to a mortgagee offering to pay the costs and charges against the land, although the secretary had no written authority to make such sale.

5. BROKERS—ORAL CONTRACT OF EMPLOYMENT.—It is not necessary that authority to sell and make a binding contract for the sale of land should be in writing, as a contract employing an agent to find a purchaser for land is not within the statute of frauds.

6. ATTORNEY AND CLIENT—AUTHORITY OF ATTORNEY.—Where a mortgagee instructed his attorney to redeem a lot in question from a sale for drainage districts or to acquire a title of the drainage district, such attorney had authority to make a binding contract for the purchase of a lot from the district which had bid it in for unpaid drainage assessments, notwithstanding the attorney had no written authority.

7. DRAINS—PURCHASER WITH NOTICE OF OUTSTANDING CONTRACT.— One who purchased a lot from the drainage district with knowledge that the district had agreed to convey it to another, acquired no better title against the person holding such contract for conveyance than the drainage district had.

8. MORTGAGES—RIGHT TO FORECLOSE.—Where a mortgagee of land which had been sold to a drainage district for nonpayment of taxes contracted with the district to redeem the property, as against one who took a quitclaim deed from the district with knowledge of the mortgagee's rights under the contract, such mortgagee is entitled to foreclose its lien.

Appeal from Poinsett Chancery Court; *J. M. Futrell*, Chancellor; affirmed.

### STATEMENT OF FACTS.

Jonesboro Building & Loan Association brought suit in equity against C. E. Causey to foreclose two mort-

gages on lot 1, block 3, of E. Ritter's Second Addition to the town of Marked Tree, Arkansas, to secure an indebtedness amounting in the aggregate to $1,127.30. A decree of foreclosure was entered of record on the 14th day of August, 1925, and the lot was ordered sold, in default of the payment of the indebtedness found due. Subsequently a supplemental complaint was filed, asking that Drainage District No. 7, Dick Ray and C. A. Blanton be made parties defendant.

It was alleged that Drainage District No. 7 had foreclosed its lien for unpaid drainage taxes, and that the lot in question had been sold to it; that said drainage district had first entered into a written contract to convey said lot to Dick Ray, and had subsequently executed a quitclaim deed to C. A. Blanton to said lot.

The record shows that Drainage District No. 7 brought suit in equity against C. E. Causey to foreclose its lien for unpaid drainage taxes. A decree of foreclosure was entered of record on the 3d of December, 1923, and the lot was ordered sold for the nonpayment of said drainage assessments at the time, on the terms and at the place of sale prescribed by the decree and the statute for the sale of land for unpaid drainage assessments. On the 10th day of April, 1924, the lot was offered for sale pursuant to the terms of the decree, and Drainage District No. 7 became the purchaser at the sale. The commissioner who made the sale executed a deed to said lot to said district, and this deed was approved by the chancery court.

Dick Ray had a second mortgage on said lot to. secure the sum of $6,000 owed him by C. E. Causey. He became the purchaser of the mortgages of the Jonesboro Building & Loan Association, and had them transferred to him. Subsequently he applied to A. D. Shelton, secretary of said drainage district, to purchase said lot. On November 11, 1925, the attorney of Ray wrote the following letter:

"Mr. A. D. Shelton,
Lepanto, Arkansas.

"Dear sir: On October 27, 1925, we wrote you regarding lot 1, block 3, E. Ritter's Second Addition to Marked Tree, assessed against C. E. Causey, inquiring the amount of taxes due Drainage District No. 7 for 1923. This is of considerable importance to us, as we are anxious to secure a deed to this property and to pay all taxes and charges there are against it.

"In order to facilitate matters, won't you be good enough to draw at sight on Mr. Dick Ray, Memphis, Tenn., attaching to the draft deed to him, and cause the same to be sent to the East Memphis Bank & Trust Company, Memphis, Tennessee, for collection?

"This property is being foreclosed, and, as we hold a second mortgage thereon, it is necessary that we get the title cleared up just as soon as possible.

"Thanking you to attend to this as soon as you can, we are,

"Yours very truly."

Shelton replied to the letter as follow:

"Lepanto, Arkansas, November 13, 1925.
"Ewing, King & King, Attys.
Memphis, Tenn.

"Gentlemen: Replying to your letters of October 27 and November 11, with reference to lot 1, block 3, E. Ritter's Second Addition to Marked Tree, and the amount of taxes, etc., will say that at this particular time the books are being audited, and all of the records are in the hands of the auditor. Within a few days I will get the list of taxes, and, if the same has been sold to the district, I will have quitclaim deed properly executed and delivered to you.

"It may possibly be a week or ten days, but it will be duly attended to, and draft drawn as per your instructions.

"Very truly."

On October 22, 1925, Shelton had sent to the attorneys of Ray a letter giving an itemized statement of all the taxes and assessments due upon said lot, which amounted in the aggregate to $112.31. In reply to the letter of Shelton of November 13, the attorneys of Ray wrote the following:

"November 16, 1925.

"Mr. Allen D. Shelton,
Attorney at law,
Lepanto, Arkansas.

"Dear sir: We thank you very much for yours of the 13th inst. relative to lot 1, block 3, E. Ritter's Second Addition to Marked Tree. The writer saw Mr. Ray this morning, and, if you will simply draw on him at sight through the East Memphis Bank & Trust Company of this city, attaching to the draft proper quitclaim, the same will be taken up immediately.

"If there is anything you can do to facilitate the execution of this deed, the same will be very much appreciated.

"Yours very truly."

On November 19, 1925, said drainage district executed a quitclaim deed to said lot to C. A. Blanton in consideration of $17.38.

C. E. Causey has been in possession of said lot during the whole of these proceedings. A. D. Shelton has been secretary of Drainage District No. 7 since March, 1925. He admitted receiving the letters about the lot set out above and writing the replies thereto. The board of directors of the drainage district alone had authority to execute deeds to lands owned by it. It was the policy of the board to sell the land bought by it to former owners. It was customary to sell to them upon payment of the taxes and costs due to the district. Because C. E. Causey requested the deed to be made to C. A. Blanton, the board executed the quitclaim deed in question, and disregarded its promise to convey the lot to Ray. Witness said that he was the representative of the district with whom any taxpayer or landowner would conduct

negotiations or would see in connection with redeeming his land from sale for delinquent taxes. We copy from his testimony the following:

"Q. So far as handling the matter like the one in question was concerned, you had the authority to do that, and you were the one who handled those of that kind? A. I think I took that authority. After they have gone delinquent, I could really have a right to sell this land to anybody who wants it."

According to the testimony of C. E. Causey and C. A. Blanton, there was no collusion between them about the purchase of the land. Causey asked the secretary of the district to execute a deed to Blanton, because he owed Blanton and preferred to favor him to his other creditors. Blanton admitted that he had not collected any rent from Causey, who still occupied the house on the lot in question, but said that the reason he had not done so was because the matter became involved in litigation at once, and he thought he would wait until he saw whether or not his title was valid.

The chancellor found that Drainage District No. 7 had no authority to execute a quitclaim deed to C. A. Blanton, and that the contract between said drainage district and Dick Ray was valid. It was therefore decreed that Blanton hold the legal title as trustee for the benefit of C. E. Causey, and that the lot should be sold to secure the payment of the mortgage liens due the Jonesboro Building & Loan Association and Dick Ray. C. A. Blanton has duly prosecuted an appeal to this court.

*C. T. Carpenter,* for appellant.

*Hawthorne, Hawthorne & Wheatley, Eugene Sloan* and *Ewing, King & King,* for appellee.

HART, C. J., (after stating the facts). The title was acquired by the drainage district when the land was struck off to it in April, 1924, and the deed was made to the board of directors of the drainage district by the commissioner who made the sale. There was a valid decree of foreclosure for the nonpayment of drainage

taxes, and the statute was in all respects complied with by the commissioner who made the sale, and the conveyance in pursuance thereof to the board of directors was a valid one. The drainage district was organized under a special act passed by the Legislature of 1917. Acts 1917, vol. 1, page 1053. The suit was instituted by the district against Causey, as owner of the land, for the nonpayment of drainage taxes, in accordance with § 28 of the act. When the land was sold under the decree, the board of directors of the drainage district became the purchaser thereof. Section 28 provides that, where lands are offered for sale as provided by the act, and the amount of the taxes due, with interest, costs and penalty, is not bid at the sale, the commissioner shall bid the land in in the name of said board of directors of said drainage district for the whole amount due as aforesaid. The section further provides that the commissioner shall then execute his deed thereto as in other cases under this act, conveying such land to such drainage district, and that such deed, when duly executed in conformity to the provisions of the act, and recorded, shall be received as evidence in all cases, showing an indefeasible title in said purchaser, unassailable in law or in equity.

In *Douglass v. Lewis,* 131 U. S. 45, 9 S. Ct. 634, 33 L. ed. 53, it was said that a covenant that the grantee is seized of an indefeasible estate in fee simple is a covenant for a perfect title. Hence, under the provision of the statute just referred to, the drainage district acquired an absolute title to the land after the period of redemption provided by the statute had expired.

While there is no express provision authorizing the drainage district to sell lands acquired by it in this manner, we think the power to sell arises by necessary implication. It would seem that there would be no use in providing that the district should have an absolute title to lands purchased by it for the nonpayment of drainage assessments if they could not sell the lands in aid of the drainage work. The drainage board was an involuntary *quasi* corporation created to construct a public work, author-

ized to procure the means to accomplish the improvement by the imposition of assessments upon private property. It was a governmental agency existing for a public purpose, and, while it could hold no real estate in a proprietary sense, it was empowered to bid in the land at a public sale for the nonpayment of drainage assessments and to acquire an absolute title thereto, and this, we think, by necessary implication, gave power to resell the lands for the purpose of acquiring funds for the prosecution of the drainage work. This view receives support from the following cases: *Altheimer* v. *Board of Directors Plum Bayou Levee Dist.*, 79 Ark. 229, 95 S. W. 140; *Board of Directors St. Francis Levee District* v. *Fleming*, 93 Ark. 490, 125 S. W. 132, 659; and *Chicago Mill & Lumber Co.* v. *Drainage Dist. No. 17*, 172 Ark. 1059, 291 S. W. 810.

It is next contended that no valid contract was made with Ray by the district for the purchase of the land. We have copied the letters written by the attorneys of Ray and the replies of the secretary of the drainage district thereto. In these letters the terms of the contract are plainly set out. The names of the contracting parties are given, there is a proper description of the lot to be sold, and the price and method of payment are given. This constituted a valid contract which might be specifically enforced between private parties. *Moore* v. *Exelby*, 170 Ark. 908, 281 S. W. 671.

We can see no reason why the doctrine of specific performance should not apply to a drainage district. But it is contended that Shelton had no power to make the contract, and reliance is placed upon the case of *St. Francis Levee District* v. *Cottonwood Lumber Company*, 86 Ark. 221, 110 S. W. 805, and *Ritter* v. *Board of Directors of St. Francis Levee District*, 128 Ark. 324, 194 S. W. 13. We do not think these cases apply. In the first case it was held that the district was not bound by the unauthorized promise of the secretary of the board. The same holding was made in the latter case with regard to the unauthorized act of the president. The court held

that, while he had authority, under the statute, to make the deed, he had no power to enter into a covenant to refund the purchase price if the title failed, and that he could not execute a deed with covenants of warranty. Quite a different situation confronts us here. The secretary of the board testified that it was his custom to act for the board in making contracts for the redemption of the land or the repurchase of it by the owner or by those interested in it. He said that it was the custom to give a preferential right to the owner. It is fairly inferable from his testimony, which is not contradicted, that he had the power to enter into a contract on behalf of the board for lands which had been sold to it under foreclosure proceedings for the nonpayment of the drainage assessments. Of course, in all cases the deed would be executed by the board of directors of the drainage district in whom was the legal title. This court has held repeatedly, however, that it is not necessary that authority to sell and make a binding contract for the sale of land should be in writing. The reason is that a contract employing an agent to find a purchaser of land is not within the statute of frauds. *Moore* v. *Exelby,* 170 Ark. 908, 281 S. W. 671, and cases cited.

The rule announced in these cases would also govern the power of the attorneys of Ray to execute a contract for him. According to the testimony of Ray and of one of his attorneys, he had placed the matter in their hands for the purpose of redeeming the lot in question from the sale for drainage taxes, or in some way acquiring the title of the drainage district to it, in order that he might subject it to the payment of his mortgage. It was realized that the lot was worth more than the amount of the drainage district tax, interest and costs. Hence we think the record shows that the attorneys of Ray had a right to make a binding contract for the sale of said lot to Ray and that the secretary of the district had a right to make a binding contract for it.

The letters on their face purport to be a completed contract, and became enforceable as a written agreement

before the quitclaim deed to Blanton was executed. The record shows that Blanton purchased the lot with notice of the outstanding contract made by the secretary of the drainage district with Ray. Indeed, this is how came Blanton to purchase the lot. The secretary of the drainage district told him about the letters he had written to Ray, and Blanton persuaded Causey to ask the board of directors of the drainage district to execute a deed to Blanton, and the latter, having notice of the contract of Ray, acquired no better title to the lot than the drainage district in whose shoes he stands. *Vance* v. *Newman,* 72 Ark. 359, 80 S.W. 574, 105 Am. St. Rep. 42; and *Adams* v. *Rhodes,* 143 Ark. 172, 220 S. W. 29. In the latter case it was expressly held that, where a defendant had contracted to sell land to the plaintiff, a third person who purchased the land with notice of his rights is not an innocent purchaser, and plaintiff is entitled to specific performance as against him.

The result of our views is that the decree of the chancery court was correct, and it will be affirmed.