HITER *v.* HARAHAN VIADUCT IMPROVEMENT DISTRICT.

Opinion delivered July 14, 1924.

1. HIGHWAYS—IMPROVEMENT DISTRICT—DESCRIPTION OF BOUNDARIES.—The act creating the Harahan Viaduct Improvement District (Special Acts 1923, p. 1243) in describing the boundaries of the district as including "all of the real property in the limits of the St. Francis Levee District," without a more particular description, contemplates that the boundaries shall be coextensive with the present boundaries of the levee district, and is not void for uncertainty.

2. HIGHWAYS—CHANGE IN ROUTE—APPROVAL OF COUNTY COURT.—The act creating the Harahan Viaduct Improvement District (Special Acts 1923, p. 1243) provided that the new viaduct should be constructed along substantially the route of the existing wooden viaduct, that the adoption of the route must meet with the approval of the county court, and that if, in the opinion of the board of commissioners, it was impracticable to construct a viaduct along the route of the present wooden viaduct they should have power to select another route for the construction of said viaduct. *Held* that the act did not contemplate that material changes in the route could be made without the approval of the county court, and was not invalid as invading the jurisdiction of that court.

3. HIGHWAYS—IMPROVEMENT DISTRICT.—In providing for the construction of a new viaduct to take the place of an old structure, the Legislature could provide that, as a part of the improvement, the old structure should be repaired and maintained at the cost of the improvement district, and that the acquisition of the old structure should be treated as a part of the new improvement to the extent of the unpaid indebtedness on it.

4. HIGHWAYS—IMPROVEMENT DISTRICT—AUTHORITY TO INCUMBER DISTRICT.—Under the act creating the Harahan Viaduct Improvement District, which provides that no liens shall be created "until three-fourths of the improvements shall be paid or provided by the United States Government, the State of Tennessee or some political subdivisions thereof, or some other

outside agency" (Special Acts 1923, p. 1243, § 27), the intent was to forbid the incumbering of the lands of the district with the costs of construction in excess of one-fourth thereof, and that nothing should be done until the other three-fourths should be "paid or provided" from other sources.

5.  HIGHWAYS—IMPROVEMENT DISTRICT—PRELIMINARY EXPENSES.—Under the act creating the Harahan Viaduct Improvement District (Special Acts 1923, p. 1243, § 25) the commissioners were authorized to do preliminary work to determine whether or not the improvement can be constructed within the limits prescribed in the act, and may issue certificates of indebtedness therefor, but not negotiable paper; but no separate taxes can be levied for the purpose of paying such indebtedness except in the event that the construction of the improvement is abandoned, in which case a levy of taxes may be made by the chancery court in a suit to wind up the affairs of the district.

6.  HIGHWAYS—CONSTRUCTION OF ACT CREATING IMPROVEMENT DISTRICT.—The act creating the Harahan Viaduct Improvement District, in providing in § 6 that the district should repair the old viaduct and pay the remaining indebtedness of Crittenden County thereon, did not contemplate two separate projects, and contemplated only one assessment for the entire project, including the temporary maintenance of the old viaduct and the construction of the new.

7.  IMPROVEMENT DISTRICTS—AUTHORITY TO ISSUE BONDS.—Until the assessments have been made in an improvement district, so as to demonstrate that the cost of the improvement will not exceed the benefits, there is no authority to issue bonds or make other contracts looking to the construction of the improvement.

Appeal from St. Francis Chancery Court; *A. L. Hutchins*, Chancellor; reversed.

*L. C. Going,* for appellant.

1. The act takes from the county court its original jurisdiction to establish the route of the proposed improvement and lodges the same in the commissioners.

2. The boundaries of the district are indefinite and uncertain, and lands are omitted which would be benefited, making the act an arbitrary exercise of legislative power.

3. The finding of the Legislature that the lands would be benefited to the extent of the cost of the improvement, including the indebtedness of Crittenden County, is arbitrary, unreasonable and capricious.

4. The acts of the commissioners in creating preliminary expenses and issuing certificates of indebtedness and in preparing to make an assessment upon the lands to pay same are void.

*J. C. Brookfield* and *M. B. Norfleet, Jr.,* for appellee.

The boundaries of the district are definite and certain, and include all lands in the levee district as of the date the present act went into effect. 103 Ark. 452. A district is not invalid because certain lands may be benefited which are not taxed. 139 Ark. 153; 133 Ark. 380; 139 Ark. 534; 141 Ark. 301; 146 Ark. 247; 155 Ark. 176. A legislative finding of benefits is in accordance with law. 239 U. S. 237. The district may lawfully pay the outstanding indebtedness of Crittenden County under the following authorities: 114 Ark. 360; 139 Ark. 347; 154 Ark. 551; 156 Ark. 267. See also 79 Ark. 233. The commissioners have the power to contract for and pay for preliminary expenses. 151 Ark. 47; they may issue negotiable notes. 152 Ark. 422. Section 26 of the act has been complied with in that three-fourths of the total cost has been provided from outside sources.

*A. B. Shafer, amicus curiae,* for interveners.

McCULLOCH, C. J. There is a bridge across the Mississippi River at Memphis, known as the Harahan bridge. It was constructed and is maintained by a corporation for use primarily as a railroad bridge, but, under the requirements of the act of Congress authorizing its construction, provision is made for other modes of travel by vehicles or by pedestrians, and it is operated for those purposes as a free bridge. The Arkansas terminus of the bridge is in Crittenden County, and that county several years ago constructed a viaduct from the terminus of the wagonway of the bridge to the levee constructed and maintained by the St. Francis Levee District, so as to connect with the public highway and afford means for travelers to approach the bridge. The viaduct is a wooden structure, and Crittenden County still owes a large amount of indebtedness for the cost of the structure, estimated now to be about $100,000. The wooden

viaduct was deemed to be insufficient for travel permanently, and the General Assembly of 1923 (Special Acts 1923, p. 1243) enacted a statute creating an improvement district comprising "all of the real property in the limits of the St. Francis Levee District, which district was organized and established as an improvement district under the act of February 15, 1893," and designated as "Harahan Viaduct Improvement District," for the purpose of constructing and maintaining "a viaduct as a public highway connecting the terminus of the wagonway of the Harahan Bridge spanning the Mississippi River at Memphis with the levee of the St. Francis Levee District opposite the same, and to maintain or have maintained said viaduct in a state of good repair." The statute names the commissioners, provides means for electing their successors, authorizes the employment of attorneys and engineers, and also provides for the assessment of benefits to lands in the district, the levying of taxes thereon, the letting of contracts for the construction of the improvement, and the issuance of bonds to obtain money to hasten the work of constructing the improvement. The statute, in other words, provides a complete scheme for constructing and maintaining the improvement and paying for the same as in similar acts enacted in recent sessions of the Legislature for the improvement of roads and for other improvements. Sections 6 and 7 of the statute read as follows:

"Section 6. The board of commissioners shall have the power to maintain and repair that part of the wagonway of the Harahan bridge situated in Crittenden County, Arkansas, until such time as a new viaduct, contemplated under the terms of this act, is constructed, and the benefits to be derived therefrom by the lands in the district shall be considered and assessed in making the assessment of benefits, and to secure funds therefor the board shall have power to borrow money, issue bonds, and pledge the assessment of benefits conferred by this act for other purposes, and the repair and maintenance

of such wagonway shall be considered as part of the work of improvement in the district.

"Section 7. As the construction of the viaduct authorized by this act will destroy the use of the existing wooden viaduct, the district shall assume and pay the outstanding indebtedness of Crittenden County created in the construction of said wooden viaduct, not yet due and unpaid, but in no event shall said board of commissioners assume and pay any indebtedness created in the construction of said wooden viaduct that is past due and unpaid."

Section 8 of the statute provides that the new viaduct "shall be constructed along substantially the route now occupied by the existing wooden viaduct belonging to the said Crittenden County, if the same be a practicable route, in the opinion of said board, and if the same meet with the approval of the county court of Crittenden County; and if, in the opinion of said board, it is impracticable to construct a viaduct along the route of the present wooden viaduct, they shall have the power to select another route for the construction of the said viaduct."

Sections 25, 26 and 27 read as follows:

"Section 25. If, for any reason, the improvements contemplated by this act are not made, the preliminary expenses of the district shall be a first lien upon all the lands of the district and shall be paid by a levy of a tax thereon upon the assessed value for State and county taxation, which levy shall be made by the chancery court, and shall be collected by a receiver to be appointed by said court.

"Section 26. Said viaduct shall be at all times maintained as a free viaduct, and it shall be unlawful for said board of commissioners or for any agency of the State to establish toll-gates on same, or to charge for passageway over the same. Said board of commissioners are hereby authorized and are hereby given full authority, and it is their duty, to accept from outside sources contributions to the construction cost of said viaduct, including any and all contributions that they may be able to

obtain from the Federal Government, the State of Tennessee, or from any other source. Provided, that no liens shall be created on the lands or improvements made under the terms of this act until three-fourths of the cost of the improvements shall be paid or provided by the United States Government, the State of Tennessee, or some political subdivisions thereof, or some other outside agency.

"Section 27. After determining the cost of construction of said viaduct, and approving the plans, as herein provided, it is the duty of the board of commissioners to determine the amount of outside contributions available for the construction of the improvement, and in making a levy and issuing bonds for the construction of said improvements the said board of commissioners shall credit the construction cost of said viaduct with such contributions, and issue bonds alone for the remainder. Provided, that the total bond issue authorized under this act shall in no event exceed one-fourth of the total cost of construction."

The board of commissioners has organized and has employed engineers, attorneys and other agents and servants, and are proceeding with the preliminary work of preparing plans and specifications, determining the exact route of the viaduct, and have otherwise made preparations to construct the improvement, and have already incurred considerable debt for which certificates of indebtedness had been issued.

Appellant is the owner of real property in the district, and he instituted this action in the chancery court of St. Francis County attacking the validity of the statute creating the district and seeking to restrain the commissioners from proceeding to operate under its provisions. He also alleges that the condition expressed in § 26 of the statute, with respect to obtaining funds from other sources, has not been complied with, and that, notwithstanding, the commissioners are proceeding with the work in violation of that part of the statute. He also alleges that the commissioners are about to make

assessments of benefits and levy taxes to pay the preliminary expenses and to issue bonds in advance of any ascertainment whether the improvement can be constructed.

The answer of appellee admits the truth of the allegations of fact set forth in the complaint except the allegation with respect to failure to comply with the proviso set forth in § 26, and it is alleged in the answer that there has been a compliance with that proviso in that the Federal Government has provided for the payment of one-half of the cost of the improvement and that the State of Tennessee has made provision for the payment of one-fourth of the cost of the improvement. That is the only issue of fact involved in the case.

Appellee took the testimony of two of its officers, who testified in substance that the total cost of the improvement had been estimated at the sum of $1,000,-000, and that they "had been assured by Mr. McDonald, chief of the bureau of public roads of the Agricultural Department of the United States, that $500,000 of government aid will be available to us whenever we are ready to begin the work of construction," and that the General Assembly of the State of Tennessee had, at the 1923 session, enacted a statute authorizing the city of Memphis to vote upon the question of issuing $250,000 in bonds for the purpose of securing funds for the construction of the viaduct, and that, on the vote of the electors of the city of Memphis, the bond issue had been approved, and that the commissioners of the district had been notified by the mayor of Memphis that $250,000 would be available on thirty days' notice.

At the final hearing of the cause the chancellor dismissed appellant's complaint for want of equity, and he has prosecuted an appeal to this court.

The statute creating the district provides for the advancement of any case in the Supreme Court involving the validity of the statute or proceedings thereunder, and, in accordance with that statute, this court made an order on June 9, 1924, advancing the case and setting it

for submission on June 30, on which latter date certain owners of real property in the district, other than appellant, appeared in this court and asked leave to intervene for the purpose of showing that the litigation between appellant and appellee was collusive, that the cause had been unduly hastened for the purpose of cutting off opportunity for other property owners to be heard, and that the testimony upon the issue of fact involved in the case had not been fully developed. The interveners asked that the court either dismiss the cause or that its consideration in this court be postponed until the interveners could institute another action raising the issue of fact involved in the controversy, and take additional testimony directed to that issue. Upon consideration of the matter it was concluded by the court that the litigation was not conducted by the parties collusively, and that the cause should not be dismissed for that reason. We passed the case for a week for submission, with leave to the attorneys for appellee to file a brief, and we reserved, at that time, the decision of the question whether or not the issue of fact was fully developed. The attorneys for the interveners filed a brief as *amici curiae,* joining in with appellant in all of the attacks made on the validity of the statute and the attempted proceedings thereunder. In the consideration of the testimony adduced in the case we readily reached a conclusion in favor of appellant and in favor of the contention of the interveners upon the only issue of fact involved in the case, and, as the interveners, through their attorneys as friends of the court, have presented their views upon the questions of law involved, no prejudice can result to any of the parties appearing here from finally determining the case at this time, without any further postponement. We proceed therefore to that task.

It is contended, in the first place, that the act is void for uncertainty, in that it merely describes the boundaries of the district to include "all of the real property in the limits of the St. Francis Levee District," without a more particular description. It is suggested in the

argument in support of appellant's contention that, after the creation of the St. Francis Levee District by the act of February 15, 1893, prescribing the boundaries, some of the lands were eliminated because not found to be benefited from the construction of the levee, and that the statute now under consideration does not show whether the present district is to be coextensive with the original boundaries of the district or whether it shall exclude the lands which were excluded from the district because not benefited. It is plain from a consideration of the language of the present statute that its framers meant to make the boundaries of this district coextensive with the present boundaries of the St. Francis Levee District, and that it does not include lands heretofore excluded from the St. Francis Levee District. The act of April 15, 1893, creating the St. Francis Levee District (Acts 1893, p. 24) describes the boundaries of the district as follows: "Beginning on the left bank of St. Francis River, at its confluence with the Mississippi River, thence in a northwesterly direction along said left bank of the St. Francis River to the southern boundary line of Lee County, to extreme high water line on the base or slope of the highlands, thence in a northerly direction with the meanderings of the said highlands to the north boundary line of Craighead County, thence east along said north boundary line to the north line of Mississippi County, thence along said line to the Mississippi River, thence in a southerly direction along said right bank of the Mississippi River to the place of beginning, containing all that area which has heretofore at any time, either directly or indirectly, overflowed by water from the Mississippi River."

It will be noted from the language of the act of 1893, *supra,* that definite means were prescribed and pointed out for ascertaining the boundaries of the district; still the boundaries were not accurately described, and the lines remained to be ascertained by a survey following the directions prescribed in the statute. The boundaries of the district were ascertained by determining, from

proper surveys and other investigations, "the extreme high-water line on the base or slope of the highlands," and the boundaries as thus ascertained and established and as now existent were declared by the present statute to be the boundaries of the Harahan Viaduct Improvement District. The fact that the boundaries are described merely by reference to the boundaries of the St. Francis Levee District does not render the description indefinite. Our decision in the recent case of *Britt* v. *Laconia Circle Special Drainage District, ante,* p. 92, is decisive of the question now presented. In that case the drainage district known as the Laconia Circle Special Drainage District was created, and the boundaries were described as embracing all lands within what is "generally and historically known as Laconia Circle, in Mississippi Township, in Desha County, Arkansas," and we decided that the description was sufficient. We think that the principle announced in that case is decisive of the present case, and that this attack is unfounded.

The validity of the statute is next assailed on the ground that it constitutes an invasion of the jurisdiction of the county court, in conferring authority upon the commissioners of the district to select the route of the viaduct without the approval of the county court. This attack is also unfounded. Section 4 of the statute refers to the viaduct as a "public highway," and, for the purpose of this discussion, we may as well treat it as such, without stopping to consider whether it is in fact a part of the bridge or a part of the highway. But, in either event, any change of route authorized by the statute is necessarily slight and immaterial, for the statute itself fixes the location of the viaduct by prescribing that it must connect the end of the wagonway of the Harahan bridge "with the levee of the St. Francis Levee District opposite the same." Giving this language a practical interpretation, it necessarily means that the route of the viaduct shall be from the end of the bridge to a point on the levee substantially opposite the end of the bridge. From this specification there could be no substantial

change in the route, and any attempt on the part of the commissioners to make a substantial change would be beyond the authority conferred under the statute, and such attempt could be restrained. We have held that immaterial changes in the route of a public highway to be improved could be made by commissioners without the approval of the county court. *Wimberly* v. *Road Imp. Dist. No. 7,* 161 Ark. 79. The statute provides that the adoption of the route of the existing wooden viaduct must meet with the approval of the county court, and the obvious reason for that was that it is a structure which was built by the county, and for which there was an outstanding indebtedness, and it was deemed wise not to permit that structure to be disturbed without the consent of the county. But this provision necessarily meant that whatever route was selected would supersede the old wooden structure, and that the approval of the county court should be obtained. As we have already said, any change in the route would necessarily be immaterial, and the construction of the new viaduct would necessarily supersede the old structure, therefore the only reasonable interpretation to put upon the language of the statute is that any route adopted, even though it deviated from the route of the present structure, must be approved by the county court.

The case of *Haley* v. *Sullivan,* 162 Ark. 59, relied on by counsel, is not applicable, for the reason that the language of the statute involved in that case is very different from that used in the statute now under consideration. In that case the statute plainly, according to the view of a majority of the court, authorized the commissioners of the district to adopt, without the approval of the county court, a new route for a road wholly different from the public road described in the statute.

We have not considered, in this connection, the statute enacted by the General Assembly at the extraordinary session in September, 1923, which contains a

provision that all plans for the improvement must be made subject to the approval of the county court. The validity of that statute is challenged by counsel, but we find that the question of its validity or invalidity is not really involved in the present controversy, and we will not therefore consider that question at the present time.

The next ground of attack on the validity of the statute is that it gives authority to the commissioners to repair and temporarily maintain that part of roadway of the bridge in Crittenden County and to assume and discharge the indebtedness incurred by Crittenden County in the construction of the old viaduct. It will be remembered that § 6 of the statute provides that the commissioners "shall have the power to maintain and repair that part of the wagonway of the Harahan bridge situated in Crittenden County, Arkansas, until such time as a new viaduct, contemplated under the terms of this act, is constructed;" that "the benefits to be derived therefrom by the lands in the district shall be considered and assessed in making the assessment of benefits;" that the repair and maintenance of the wagonway "shall be considered as a part of the work of improvement in the district," and that, in order to secure funds, the commissioners "shall have power to borrow money, issue bonds, and pledge the assessment of benefits conferred by this act for other purposes." Section 7, as we have already seen, recites that the construction of the new viaduct "will destroy the use of the existing wooden viaduct," and provides that "the districts shall assume and pay the outstanding indebtedness of Crittenden County, created in the construction of said wooden viaduct, not yet due and unpaid." We perceive no valid reason why the Legislature cannot prescribe, in giving authority for the construction of the new improvement, that, as a part of the improvement, the old structure, which is to be supplanted by the new, shall be repaired and maintained at the cost of the new district, and that the acquisition of the old structure shall be treated as a part of the new improvement to the extent of the

unpaid indebtedness on it. The statute constitutes a legislative determination that the old structure shall be supplanted by the new, and that its value is equal to the unpaid part of the cost of construction. *McClelland* v. *Pittman,* 139 Ark. 341; *Southern Crawford Road Imp. Dist.* v. *Brown,* 156 Ark. 267; *Wagner* v. *Lesser,* 239 U. S. 207; *Valley Farms Co.* v. *Westchester,* 261 U S. 155. It is not essential to the validity of this provision of the statute that the old structure should actually enter into and become a part of the new. On the contrary, the fact that the old structure is to be destroyed and supplanted is sufficient to authorize the provision for the payment to the county, by way of compensation, of the present value of the old structure, which, as before stated, is estimated to be the unpaid amount of the cost.

We next come to a consideration of the attacks upon the acts of the commissioners in exercising the authority conferred by the statute. The first is that the condition prescribed in § 26 of the statute with respect to contributions of three-fourths of the cost of the improvement from the United States Government or from the State of Tennessee had not been complied with, and that the commissioners are about to proceed, notwithstanding, to levy assessments, make contracts and issue bonds for the construction of the improvement. It is conceded by the commissioners that they are preparing to proceed with the construction of the improvement, but they contend that the condition of the statute has been performed. Testimony was adduced on that issue, but we are of the opinion that the evidence shows that there had been no performance of the condition. All that the testimony establishes is that Mr. McDonald, chief of the bureau of public roads of the Agricultural Department of the United States, has "assured" the commissioners that $500,000 of Government aid would be available whenever needed. This is far from showing a compliance with the requirements of the statute, which requires that no lien shall be created until three-fourths of the cost of the

improvement "shall be paid or provided by the United States Government, the State of Tennessee, or some political subdivision thereof, or some other outside agency." There is no mistaking the meaning of this language of the statute. The plain purpose of the lawmakers was to forbid the incumbering of the lands of the district with the cost of construction in excess of one-fourth thereof, and that nothing should be done until the other three-fourths should be "paid or provided" from other sources. This states' a condition precedent which must be performed before the lands can be incumbered with any of the cost of construction. It is not claimed that anything has been paid, and the evidence does not show any legal provision from any other source. The testimony on this subject is only hearsay—the witnesses only state what Mr. McDonald said, and, even if that be treated as an official statement, it does not show any authority on the part of that official to bind the United States Government. We think this language means that there must be some actual and enforceable provision made for the contribution of this fund—not a mere promise from any source, but an actual provision, a setting apart so that the fund will be available when called for, and official evidence of it must be established before the commissioners of this district are authorized to proceed. Being forbidden to construct the improvement unless three-fourths of the expense is provided from other sources, the commissioners have no right to incumber the lands with taxes for construction, when the scheme would prove abortive unless the remainder of the funds should be furnished. Certainly one-fourth construction without the completion of the project would be of no benefit to the lands in the district, and the commissioners have no power to burden the district unless a benefit may be anticipated. Our conclusion therefore is that the attempt of the commissioners is unauthorized, and that, as no provision has been made for the contribution of the remaining cost of the improvement, they have no right to

proceed with the construction of the improvement or with the sale of bonds.

It is also contended by counsel that the commissioners have no right to proceed with the preliminary work or to issue certificates of indebtedness for the cost of such work until the conditions of the act have been complied with, but we are of the opinion that counsel are mistaken in this respect in their interpretation of the statute. The conditions prescribed in § 26 manifestly relate to the construction of the improvement, and not to the preliminary work for the purpose of determining whether or not the improvement can be constructed within the limits prescribed in the statute. Preliminary plans and specifications must be made and estimates must also be made of the cost, so as to determine whether outside funds of sufficient amount are available, and to ascertain whether or not the benefit to the property will be sufficient. These are matters which necessarily must be attended to in advance, and it was not the purpose of the statute, we think, to prevent this preliminary work being done until three-fourths of the funds are provided from other sources. Section 25, hereinbefore quoted, provides for the payment of preliminary expenses in the event that the effort to construct the improvement shall prove abortive, and this shows that it was not in contemplation of the lawmakers that the other three-fourths of the cost of the improvement should be obtained before preliminary work is begun. The commissioners have a right to make contracts for preliminary work. *Southern Crawford Road Imp. Dist.* v. *Brown, supra.* Any such contract made by the commissioners is, of course, subject to review by the courts on a charge of improvidence or fraud, but such contracts, if fairly and not improvidently made, are binding on the district. Having such authority to incur liability on the part of the district, the commissioners may issue evidences of indebtedness therefor, but not negotiable paper. *Altheimer* v. *Board of Directors Plum Bayou Levee Dist.,* 79 Ark. 229. The theory entertained by the commissioners, however, in determining their

powers and duties, seems to be that they have the right to levy assessments to pay preliminary expenses before the ascertainment of the question whether or not the improvement can be made. We think this theory is unsound, and that the authority to impose assessments on the lands, independently of the construction of the improvement, can only be exercised under § 25 of the statute after it is determined that the scheme will prove abortive and the improvement cannot for any reason be made. If the conditions are all performed and the improvement is constructed, then preliminary expenses are merged into the general cost of the improvement as a part thereof, and are paid out of the funds received from the sale of bonds and the collection of assessments. There is no provision for a separate levy of taxes to pay preliminary expenses except in the event that the construction of the improvement is abandoned, in which case there is a provision in § 25 for the levy of taxes to be made by the chancery court in a proceeding to wind up the affairs of the district. The commissioners concede that they are about to make such a levy, and, as the improvement had not been abandoned, nor have the conditions upon which they are proceeding with the improvement been performed, they should be restrained from levying any assessment at this time.

Another theory contended for by the commissioners is that the repairing of the old viaduct and the payment of the indebtedness owing by Crittenden County together constitute a project separate and apart from the construction of the new viaduct, and that they may proceed with the performance of that part of the work without waiting for the conditions to be performed with respect to the construction of the new viaduct. They are mistaken in this theory, for there is no indication in the language of the statute of an intention to create two separate projects. On the contrary, it is manifest that the whole thing is treated as one project; that is to say, the repair and maintenance of the old viaduct until the new one is ready for use, the payment of the indebtedness

of Crittenden County, and the construction of the new viaduct all form a part of a single project. The language of § 6, we think, is plain on that subject. Only one assessment is provided for, and that is for the whole improvement, including the temporary maintenance of the old viaduct and the construction of the new, and also the payment of the Crittenden County debts for the cost of the old viaduct. The commissioners concede that they are about to proceed with that work, issue bonds and levy assessments, and they should be restrained from doing so until the conditions are performed with respect to the construction of the whole improvement, that is to say, until three-fourths of the total cost of the improvement shall be paid or provided as prescribed in § 26 of the statute.

We have refrained from any discussion of the question of the method of assessments, as that would be premature, in view of the fact that the assessments have not been made or actually attempted.

In conclusion, we call attention to the oft-repeated rule of law announced by this court in such cases, that, until all the conditions imposed by law have been performed by ascertaining whether or not the improvement can be made within the bounds set by the statute, that is to say, until the assessments have been made so as to demonstrate that the cost of the improvement will not exceed the benefits, there is no authority to issue bonds or make any other contract looking to the construction of the improvement. Until those conditions are performed, the authority of the district is limited to preliminary work.

The conclusion therefore reached in this case is that the statute is valid, but that the commissioners are about to exceed their powers in the respects hereinbefore mentioned.

The decree is therefore reversed, and the cause remanded with directions to enter a decree in accordance with this opinion, restraining the commissioners of the

district from proceeding with any work of construction as defined in this opinion, including the temporary repairs to the old viaduct, and the payment of the indebtedness of Crittenden County and the issuance of bonds and the levying of taxes, until three-fourths of the funds have been provided from other sources, in accordance with the terms of the statute.

HART, J. Mr. Justice HUMPHREYS and myself think that the hearing of this case should have been postponed until the court reconvenes in the fall, to the end that the interveners might have time to present the issues raised by their intervention in the manner in which they are advised to do so by their attorneys.

This suit was filed by appellant on June 3, 1924. An answer to the complaint was filed on the same day. Again on the same day a decree was entered of record in the case. The transcript was filed in this court on June 9, 1924. The interveners are landowners in the proposed district, and did not know of the proceedings in the court below or of the filing of the transcript on appeal in this court until some time after the appeal had been lodged here. The issues raised by the appeal involve a construction of our Constitution and of the statute creating the district. The interveners had only one week within which to file their brief. They did not even have time to have it printed under the rules of the court. No reason is given for the undue haste in bringing the case here, and no reason is assigned why the postponing of the hearing of it until next September should not have been done without prejudice to any one.

The building of the proposed improvement will necessarily place special taxes upon the lands of the district, and we think that the interveners, as landowners in the district, should have had a reasonable time in which to have presented the issues in the manner advised by their attorneys. We do not think that special taxes, which often prove to be grievous and burdensome to the landowners, should be placed upon their lands without their having a reasonable opportunity to present the

issues involved in the manner advised by their own attorneys, provided they proceed in an expeditious manner, and only ask a postponment for a reasonable time.